UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

EDWARD J NIKSICH,                          )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )          No. 2:16-cv-00206-JMS-DLP
                                           )
CORIZON INC., et al.                       )
                                           )
                    Defendants.            )

**Order Discussing Motion for Summary Judgment**

Plaintiff Edward Niksich is an inmate currently incarcerated at Wabash Valley Correctional

Facility ("Wabash Valley"). He brought this action pro se under 42 U.S.C. § 1983 against three

doctors who provided him medical care at Wabash Valley; their employer, Corizon, Inc.; and the

Warden of Wabash Valley, Richard Brown. He alleges that the defendants provided him deficient

medical care for his Hepatitis C and End-Stage Liver Disease in violation of the Eighth

Amendment. He seeks monetary damages and injunctive relief. The Court recruited counsel to

represent Mr. Niksich and engaged a neutral medical expert under Federal Rule of Evidence 706

to aid the Court in understanding the medical evidence and Mr. Niksich's medical treatment.

Presently pending are the defendants' motions for summary judgment, one by Drs.

Benjamin Loveridge, Samuel Byrd, and Richard Hinchman,[1] and Corizon (the "Medical

Defendants"), and a second by Warden Brown. For the reasons explained below, the Medical

Defendants' motion for summary judgment is **granted in part** and **denied in part**, and Warden

Brown's motion for summary judgment is **granted**.

---

[1] The clerk is **directed to update the docket** to reflect that defendant "Dr. Hickman" is "Dr.
Richard Hinchman."

# I.
## Summary Judgment Legal Standard

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Barbera v. Pearson Education, Inc.*, 906 F.3d 621, 628 (7th Cir. 2018). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

# II.
## Background

The following factual background is drawn from the undisputed evidence submitted by the parties. Many of the facts that follow are disputed. The Court notes some of these disputes, but whether noted or not, the facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

Mr. Niksich has been an inmate with the Indiana Department of Correction since 1990. Filing No. 152-1 at 1. He was diagnosed with Hepatitis C that same year. *Id.* On November 28, 2012, Mr. Niksich's liver failed due to his Hepatitis C and advanced cirrhosis. *Id.* at 2. Mr. Niksich had, and continues to have, End-Stage Liver Disease ("ESLD"). Filing No. 144-1 at 2. After his liver failed, he was in a coma and hospitalized for seven days. Filing No. 152-1 at 2. When he regained consciousness, he was told by a Corizon physician that his ESLD was terminal. *Id.* ESLD can only be cured by a liver transplant.[2] Filing No. 144-1 at 2.

### A. Mr. Niksich's Treatment at New Castle by Defendant Dr. Loveridge

Mr. Niksich was transferred to New Castle Correctional Facility ("New Castle") in 2014, where he was under the care of defendant Dr. Loveridge until May 2015. Filing No. 152-1 at 2. During this time, Mr. Niksich was enrolled in the Chronic Care Clinic, which meant he was evaluated every 90 days by a medical provider and regularly underwent lab work to monitor his liver functioning and health. Filing No. 144-2 at 2.

In 2014, Mr. Niksich was experiencing abdominal pain. Dr. Loveridge prescribed several different pain medications to Mr. Niksich with varying success. First, Dr. Loveridge prescribed Ultram, but it made Mr. Niksich nauseous and upset his stomach. Filing No. 152-1 at 2. Next, Dr. Loveridge prescribed Tylenol 3, but it was ineffective. *Id.* Dr. Loveridge then prescribed Norco 7.25/325, which was effective for three or four months. Following a conversation with

---

[2] Mr. Niksich notes that he had not received any treatment for his Hepatitis C during his incarceration. However, the Court's Rule 706 Expert, Dr. Tector, testified that prior to 2013 there were "not really" any "effective" treatments for Hepatitis C. Filing No. 144-5 at 68. Dr. Tector testified that the only available one was "not very effective," with a success rate of "less than probably 15 percent." *Id.*

Corizon's then Regional Medical Director regarding Mr. Niksich's pain, Dr. Loveridge prescribed morphine,[3] which was effective in controlling Mr. Niksich's pain. *Id.* at 3.

During this period, Mr. Niksich asked Dr. Loveridge to schedule a consultation with a hepatologist or gastroenterologist ("GI") to determine why he was experiencing abdominal pain and how it should be treated, but Mr. Niksich's requests were denied. *Id.* Dr. Loveridge was approached by Nurse Perkins in May 2014 regarding Mr. Niksich. Filing No. 144-2 at 4. After reviewing Mr. Niksich's record, Dr. Loveridge advised Nurse Perkins that a consultation with a GI specialist was indicated, and Nurse Perkins submitted the request. *Id.* Corizon's then Regional Medical Director, Dr. Michael Mitcheff (who is not a defendant), suggested an alternative treatment plan, and Mr. Niksich was informed that he did not qualify for a GI specialist. *Id.* Nevertheless, Dr. Loveridge attests that the treating medical provider can always schedule a consultation with an outside specialist if he or she thinks that is best. *Id.* Once Dr. Loveridge began personally overseeing Mr. Niksich's care, he examined Mr. Niksich and determined that a GI consultation was unnecessary. *Id.* at 5.

In March 2015, Mr. Niksich's lab results showed, among other things, that Hepatitis C was "detectable at large levels in Mr. Niksich's body," so Dr. Loveridge determined Mr. Niksich should be considered for Hepatitis C treatment. Filing No. 144-2 at 11. He initiated the process for determining whether Mr. Niksich was a candidate for Hepatitis C treatment, which begins with an abdominal ultrasound. *Id.* It was shortly after he initiated this process, in late March 2015,

---

[3] Several pain medications are discussed by the parties. For clarity, the following descriptions are provided, all of which are drawn from the Mayo Clinic's website, www.mayoclinic.org (last visited May 3, 2019). Ultram is a brand name for the drug Tramadol, which is an opioid analgesic. Tylenol 3 is acetaminophen (common Tylenol) combined with codeine, which is a narcotic analgesic. Norco is a brand name of acetaminophen combined with hydrocodone, another narcotic analgesic. Finally, morphine is yet another narcotic analgesic.

when Dr. Loveridge, after consulting the Regional Medical Director, determined that Mr. Niksich should be prescribed morphine because his current pain medication was ineffective. *Id.*

In early April 2015, Dr. Loveridge conducted the next step in testing to determine if Mr. Niksich was eligible for Hepatitis C treatment. *Id.* Mr. Niksich also informed Dr. Loveridge that the morphine was helping with his pain. *Id.* at 12. On April 22, 2015, after further testing, Dr. Loveridge discussed with Mr. Niksich the risks and benefits of treating his Hepatitis C. *Id.* Mr. Niksich consented to receive Hepatitis C treatment, and Dr. Loveridge submitted a request for the treatment that day. *Id.*

Dr. Loveridge continued to order the necessary screening tests before Mr. Niksich could begin Hepatitis C treatment. *Id.* at 12-13. Dr. Loveridge renewed Mr. Niksich's morphine on May 14, 2015. Mr. Niksich was transferred from New Castle to Wabash Valley on May 29, 2015, before he began his Hepatitis C treatment, and Dr. Loveridge had no further involvement in Mr. Niksich's medical care.

**B.     Mr. Niksich's Treatment at Wabash Valley**

1.     *Mr. Niksich's Treatment by Defendant Dr. Byrd*

When Mr. Niksich was transferred to Wabash Valley, he was placed under the care of defendant Dr. Byrd and other medical providers. Mr. Niksich was transferred with several prescriptions, including one for morphine. Filing No. 144-4 at 2-3. Dr. Byrd examined Mr. Niksich on June 5, 2015, in the Chronic Care Clinic and notified him that he had been approved for the Hepatitis C treatment of Harvoni and Ribavirin. *Id.* at 3. Dr. Byrd requested those drugs

that same day.  *Id.*  Three days later, on June 8, 2015, Mr. Niksich began his twelve-week Hepatitis C treatment.[4]  *Id.*

For the next few months, Dr. Byrd periodically evaluated how the Hepatitis C treatment was working.  *Id.* at 4-5.  On September 8, 2015, Mr. Niksich received his final doses of Harvoni and Ribavirin.  It was later confirmed that the treatment had cured Mr. Niksich of Hepatitis C.  *Id.* at 7.

According to the defendants, once Mr. Niksich had completed his Hepatitis C treatment, Dr. Neil Martin determined that Mr. Niksich needed to begin tapering his pain medications, so Dr. Martin ordered a reduced dosage of morphine.  Filing No. 144-4 at 18; Filing No. 144-3 at 157-59.  Mr. Niksich attests that Dr. Martin never examined him.  Filing No. 152-1 at 4.

On September 10, Mr. Niksich spoke with Dr. Byrd while Mr. Niksich was visiting the eye clinic and x-ray clinic (although Dr. Byrd disputes that this interaction occurred).  *Id.*  Mr. Niksich complained about his lack of pain medication—specifically that he wanted to go back on morphine—and asked to see a hepatologist, but Dr. Byrd denied his requests.  *Id.*  Five days later, on September 15, 2015, Mr. Niksich felt dizzy and nauseous, experienced abdominal pain, and was urinating blood.  Filing No. 152-1 at 3.  Dr. Byrd ordered x-rays, believing the pain to be kidney pain, prescribed antibiotics, and discontinued Mr. Niksich's morphine prescription.[5]  *Id.*

---

[4] The Court's expert, Dr. Tector, testified that Mr. Niksich received this treatment "early."  Filing No. 144-5 at 68.  Specifically, Dr. Tector explained that the medications had "just came out" in 2013, and they were not "generally available at that time."  *Id.*  He was thus "surprised" that Mr. Niksich "got [them] as early as he did."  *Id.*

[5] The Medical Defendants dispute this, presenting evidence that it was Dr. Martin who discontinued Mr. Niksich's morphine on September 23, 2015, not Dr. Byrd on September 15, 2015.  Filing No. 144-4 at 5-6.

Three days later, on September 18, 2015, Dr. Martin prescribed Tylenol 3 for five days to relieve Mr. Niksich's pain from kidney stones.[6] *Id.* at 4.

Over the next several months, Mr. Niksich continued to experience abdominal pain and complained to Dr. Byrd and other medical staff about his pain, including on October 16, 2015; November 19, 2015; December 2, 2015; December 18, 2015; January 7, 2016; and January 22, 2016.[7] *Id.* As detailed further below, Mr. Niksich did not receive any pain medication during this period.

At an October 16, 2015, appointment, Mr. Niksich complained about continuing to urinate blood, but Dr. Byrd denied Mr. Niksich's request to see a hepatologist. *Id.* Mr. Niksich again complained to Dr. Byrd about abdominal pain during his appointment on November 19, 2015, as he did during all of his appointments. *Id.* at 5. Contrary to Dr. Byrd's evidence, however, Mr. Niksich never stated that he wanted to remain off opiate therapy.[8] *Id.*

At his December 2, 2015, appointment, Mr. Niksich repeated his request to see an outside specialist because he was still urinating blood and had low while blood cell and platelet counts. *Id.* Dr. Byrd denied the request, stating that Mr. Niksich needed a liver transplant, or he would not live much longer. *Id.* Mr. Niksich also reiterated that he continued to experience abdominal pain

---

[6] The Medical Defendants presented evidence that Dr. Martin prescribed Tylenol 3 for Mr. Niksich's abdominal pain. Filing No. 144-4 at 6.

[7] During many of these visits, the Medical Defendants present evidence that Mr. Niksich did not complain of abdominal pain and was satisfied with his current treatment. *See, e.g.*, Filing No. 144-4 at 8. Mr. Niksich disputes this, thus the evidence is presented in the light most favorable to him.

[8] Dr. Byrd presents evidence that Mr. Niksich stated that his pain was no longer severe, and he wished to remain off opiate therapy because "he realizes pain may be an indicator to him he is developing a serious and even life threatening condition such as [spontaneous bacterial peritonitis]." Filing No. 144-3 at 175. Dr. Byrd made similar remarks in the medical records after other appointments, but, again, Mr. Niksich disputes this.

and requested pain medication. *Id.* Contrary to Dr. Byrd's testimony, Mr. Niksich attests that he did not prefer to remain off opiate pain medication, nor did he express satisfaction with the treatment plan. *Id.*

Approximately two weeks later, on December 18, 2015, Mr. Niksich again complained to Dr. Byrd about abdominal pain, but Dr. Byrd insisted that the pain was in Mr. Niksich's back. *Id.* Dr. Byrd told Mr. Niksich he would not prescribe any pain medication for Mr. Niksich's abdominal pain. *Id.*

Dr. Byrd saw Mr. Niksich again on January 22, 2016. Mr. Niksich continued to complain of abdominal pain and urinating blood. *Id.* Mr. Niksich renewed his request to see a hepatologist or another specialist to determine why his pain and symptoms persisted. *Id.* at 6. Dr. Byrd informed Mr. Niksich that Corizon's then Regional Medical Director, defendant Dr. Hinchman, would not permit referral to a specialist. *Id.*

On February 4, 2016, Mr. Niksich submitted two healthcare request forms. Filing No. 144-3 at 197-98. One asked whether he was scheduled to see a specialist to evaluate him for a liver transplant, and the second stated he was experiencing abdominal pain and needed pain medication. *Id.* Medical providers responded that he was scheduled for an appointment. *Id.*

Dr. Byrd evaluated Mr. Niksich on February 10, 2016, due to Mr. Niksich's complaints of abdominal pain. Dr. Byrd was "puzzled" by Mr. Niksich's continued complaints of abdominal pain because Mr. Niksich did not "seem to carry a lot of fluid for Ascites to account for abdominal pain," nor should Hepatitis C cause any pain since Mr. Niksich was cured. *Id.* at 201. Dr. Byrd noted that "unfortunately" Mr. Niksich was treated with morphine in the past, which Dr. Byrd told Mr. Niksich "seemed to be a drastic measure" given that he needs to know if there is a spike in

abdominal pain "due to his high risk of [spontaneous bacterial peritonitis]." *Id.* Dr. Byrd suggested that Mr. Niksich purchase Tylenol from the commissary to treat his abdominal pain. *Id.*

Mr. Niksich repeated his request to see a specialist to Dr. Byrd on February 19, 2016, because he was still urinating blood and experiencing abdominal pain. Filing No. 152-1 at 6. But Dr. Byrd again denied his request. *Id.*

Mr. Niksich filled out a healthcare request form on March 10, 2016, because he was experiencing abdominal pain and requested pain medication. Filing No. 144-3 at 221. Specifically, he requested an appointment with Dr. Byrd, stating "I am still having abdominal pain[.] I would like pain medication renewed but know you will not do it." *Id.* Nursing staff could not provide him any treatment other than referring him to Dr. Byrd, who did not see him that day. Filing No. 152-1 at 6.

Two days later, on March 12, 2016, Mr. Niksich was evaluated by nursing staff. He informed them that he has been having abdominal pain "for a long period of time" and that morphine helped his pain. Filing No. 144-3 at 223. He further stated that some days the pain is "unbearable and other days it isn't as bad." *Id.* Mr. Niksich was sent back to his cell without any additional pain medication. Dr. Byrd attests that he was not made aware of this complaint at the time. Filing No. 144-4 at 14.

Mr. Niksich submitted another healthcare request form on March 21, 2016. He requested an appointment with Dr. Byrd, stating: "Dr. Byrd again I am requesting that you represcribe my pain medication, that you took me off. I am having abdominal pain, as in the past. . . . This is an ongoing issue and it is not getting better. [P]lease renew my pain medication prescript[ion]." Filing No. 144-3 at 225. On March 23, 2016, Mr. Niksich was dizzy, nauseous, urinating blood,

and had abdominal pain. Filing No. 152-1 at 6. He was taken to Terre Haute Regional Hospital to receive treatment. *Id.*

Mr. Niksich had returned to Wabash Valley by April 1, 2016. Dr. Byrd examined Mr. Niksich that day due to continued complaints of abdominal pain. Filing No. 144-3 at 234. Dr. Byrd's evidence reflects that he convinced Mr. Niksich to hold off on opiate pain management "as long as [Mr. Niksich] is assured this is an option given his terminal state." *Id.* Contrary to Dr. Byrd's evidence, Mr. Niksich attests that he did not did not agree to hold off receiving pain medication. Filing No. 152-1 at 6. Dr. Byrd also noted that, "given [Mr. Niksich's] terminal state, a request for opiate treatment would be reasonable, however this will have to be evaluated/approved by [the Regional Medical Director]." Filing No. 144-3 at 237.

Three weeks later, on April 22, 2016, Dr. Byrd examined Mr. Niksich who complained of abdominal pain. Dr. Byrd noted that Tylenol, Tylenol 3, and Tramadol (Ultram) have not provided pain relief for Mr. Niksich in the past, but that morphine had "successfully treated" his pain. Filing No. 144-3 at 243. Nevertheless, Dr. Byrd stated that morphine seemed like a drastic measure given the risk of spontaneous bacterial peritonitis. *Id.* Dr. Byrd stated further that pain management would be "at the discretion of the [Regional Medical Director] given [his] complete lack of experience with such cases." *Id.* Contrary to Dr. Byrd's evidence, Mr. Niksich attests that he did not agree to hold off on pain management during that appointment. *Id.*

Five days later, on April 27, 2016, Mr. Niksich submitted a healthcare request form stating, "Dr. Byrd what is happening with my pain medication prescriptions that we discussed on 4/22/16." Filing No. 144-3 at 247. The next day, on April 28, 2016, a medical provider responded that the "request [was] sent for approval." *Id.* Also, on April 28, 2016, Dr. Byrd emailed the then Regional Medical Director, Dr. Kuenzli, requesting "any suggestions" regarding Mr. Niksich's pain

management.  *Id.* at 250.  Dr. Kuenzli replied with "concerns about using" morphine, so suggested starting with Norco.  *Id.*

This was the first time Mr. Niksich was prescribed pain medication in more than six months.

On May 2, 2016, Mr. Niksich was dizzy, nauseous, feverish, experiencing abdominal pain, and urinating blood, which made it impossible for him to get out of bed.  Filing No. 152-1 at 7.  Mr. Niksich's cellmate, Dale Fugate, informed a correctional officer that Mr. Niksich needed to go to the infirmary.  *Id.*  Medical staff told the correctional officer that he needed to fill out a healthcare request form before receiving treatment, but Mr. Niksich was too sick to do so.  *Id.*  The correctional officer called the infirmary again, and he was again instructed to have Mr. Niksich fill out a healthcare request form.  *Id.*  Despite these instructions, the correctional officer took Mr. Niksich to the infirmary due to his dire health condition.  *Id.*  Mr. Niksich was then taken to Terre Haute Regional Hospital by ambulance, where he received treatment for three days.  *Id.*

Mr. Niksich returned to Wabash Valley on May 6, 2016, and was discharged from the infirmary the next day.  Filing No. 144-4 at 17.  When discharged, Dr. Byrd told Mr. Niksich that Dr. Hinchman had denied the request to be evaluated for a liver transplant.  Filing No. 152-1 at 7.  According to Dr. Byrd's evidence, Mr. Niksich complained about the low dose of Norco he was receiving, but Mr. Niksich disputes this, asserting that he did not complain about receiving Norco generally because he was happy to be receiving any pain medication.  Filing No. 152-1 at 7.

Mr. Niksich continued to complain to Dr. Byrd regarding abdominal pain and requesting more effective pain medication over the next few months.  Mr. Niksich submitted two health care request forms on May 10 and May 14, 2016.  The first requested morphine because Mr. Niksich believed the doctors from the hospital prescribed it for him.  Filing No. 144-3 at 330.  The second

requested an appointment with Dr. Byrd, stating that "[t]he Norco does not work for the pain I am having," and he again requested morphine. *Id.* at 331.

Dr. Byrd saw Mr. Niksich on May 20, 2016, for complaints of abdominal pain. *Id.* at 332. Dr. Byrd said he would discuss pain management with Dr. Kuenzli again "given lack of improvement with Norco." *Id.* at 334. Mr. Niksich submitted additional healthcare request forms on June 1 and June 9, 2016. *Id.* at 335-37. He first requested information about the possibility of a liver transplant and stated to Dr. Byrd that "[t]he Norco 5mg does not work for my abdominal pain. We discussed this at our last visit and you said you would suggest changing my pain medication back to morphine." *Id.* Then, on June 9, Mr. Niksich informed Dr. Byrd that "[t]he Norco pain medication does not work for [my] abdominal pain" and it needed "to be increased or switched to [morphine] as I was taking from February 2014 until September 23[,] 2015 when Dr. Byrd refused to renew [the] prescription. . . . Please . . . renew my prescription for [morphine]." *Id.* at 337. Mr. Niksich submitted further healthcare requests regarding the ineffectiveness of his pain management for his abdominal pain on June 15 and June 26, 2016. *Id.* at 339, 346.

There is no evidence that Dr. Byrd provided Mr. Niksich with any pain medication from October 2015 through April 2016, when Dr. Byrd eventually prescribed Norco through Dr. Kuenzli. The Court is surprised—and concerned—that the Medical Defendants did not present any evidence, let alone mention, that Dr. Byrd was unable to dispense controlled substances during the time he was treating Mr. Niksich and explain what, if any, protocols were in place given this restriction. This is especially true given that Mr. Niksich directly raised this concern at the outset of this action by submitting with his Complaint documents (that the Medical Defendants do not dispute are authentic) that reflect that Dr. Byrd surrendered his controlled substance license to the Drug Enforcement Agency ("DEA"), *see* Filing No. 2-1 at 2-3, and raised it again in response to

an interrogatory later in the case, *see* Filing No. 146-1 at 4 (Mr. Niksich's response to defendant Richard Brown's second interrogatory, which states that Richard Brown allowed Dr. Byrd to treat Mr. Niksich's severe pain even though "Dr. Byrd was unable to prescribe prescription pain killers").

The Court takes judicial notice of a declaration Dr. Byrd filed in *Perkins v. Byrd*, No. 2:15-cv-336-WTL-MJD, Filing No. 34-1 at 3.  *See Parungoa v. Community Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017) ("Courts may take judicial notice of court filings and other matters of public record when the accuracy of those documents reasonably cannot be questioned.").  In *Perkins*, Dr. Byrd acknowledged that he "voluntarily surrender[ed] [his] privileges to dispense controlled substances for three years."  *See id.*, Filing No. 25-1 at 2-3 (documents dated February 3, 2015, wherein Dr. Byrd voluntarily surrendered his license with the federal DEA that permitted him to prescribe controlled substances); *see also* Filing No. 2-1 at 2-3.  Dr. Byrd attested in *Perkins* that his inability to prescribe controlled substances has no impact on his patients because they can receive medications through another doctor at the facility.  *Id.*, Filing No. 34-1 at 3.  But he also noted that "from September to October 2015" he was "the only on-site medical doctor," so he "referred patients who might have a need for controlled substances to the Regional Medical Director."  *Id.*

### 2.    *Mr. Niksich was Referred to Indiana University's Transplant Team*

Mr. Niksich filed this action on June 8, 2016, approximately a month after Dr. Byrd told Mr. Niksich that Dr. Hinchman had denied the request to be evaluated for a liver transplant.  Filing No. 152-1 at 7.  Nevertheless, at an indeterminate time in "early June of 2016," Dr. Byrd referred Mr. Niksich to the Hepatitis C Treatment Committee (made up of medical providers throughout the Indiana Department of Correction, including Dr. Hinchman), which determined that "Mr.

Niksich's case should be referred directly to IU Health Transplant Team." Filing No. 144-1 at 5. IU Health Transplant Team is the only entity in Indiana that performs liver transplants. *Id.* Dr. Hinchman directed Dr. Byrd to complete the referral by sending the necessary paperwork and requesting an appointment. *Id.* Still in June 2016, Mr. Niksich's most recent lab results and medical records were sent to the IU Health Transplant Team.[9] *Id.*

On July 18, 2016, the IU Health Transplant Team denied Mr. Niksich's transplant referral without having examined him. In short, the letter denying eligibility stated that Mr. Niksich's incarceration renders him ineligible for a liver transplant because incarceration does not "lend[] itself to the necessary support system or controlled environment" necessary to ensure proper recovery from a liver transplant. Filing No. 144-3 at 355. However, the letter stated that medical providers at Wabash Valley should let them know if they "could assist in contacting other transplant programs who might have different candidate criteria." *Id.*

### 3. *Mr. Niksich's Treatment by Dr. Mary Chavez*

Beginning on or around July 6, 2016, Mr. Niksich was seen by Dr. Mary Chavez (who is not a defendant) instead of Dr. Byrd. He continued to complain about abdominal pain and the ineffectiveness of Norco to Dr. Chavez. Dr. Chavez increased his Norco dosage in August 2016. *Id.* at 358-59.

The increased dosage did not sufficiently alleviate Mr. Niksich's abdominal pain, and he continued to inform Dr. Chavez of this throughout September and October 2016. *See, e.g.*, *id.* at 373, 381-83. During a visit with Dr. Chavez on October 20, 2016, Mr. Niksich again complained

---

[9] The records that were sent to the IU Health Transplant Team were not preserved, and the Corizon employee who sent them was unable to state with specificity what she sent, other than the records "included [Mr. Niksich's] most recent lab work and medical records showing what treatment he was receiving." Filing No. 61-1 at 1.

that the increased dosage of Norco was ineffective and requested to be prescribed morphine. *Id.* at 385. Dr. Chavez finally prescribed Mr. Niksich morphine. *Id.* at 389.

### 4. *Mr. Niksich's Consultation with an Outside GI Specialist*

After repeated requests, Mr. Niksich was scheduled to see GI specialist, Dr. Margaret Sozio, on December 12, 2016, to evaluate his condition. Filing No. 144-3 at 405-408. Dr. Sozio's report reflected the following. Regarding pain medication, she noted that Mr. Niksich was currently on morphine, and she did not recommend changing his pain management. *Id.* at 406, 408. Dr. Sozio confirmed that Mr. Niksich's Hepatitis C was cured. *Id.* at 406. As to Mr. Niksich's cirrhosis and ESLD, she stated as follows:

> We discussed that though his model for [ESLD] is high in part because of his high bilirubin, which has been consistently predominately indirect, clinically he is doing well with his symptoms under good control. He recalls being referred for transplant, but with him being currently incarcerated, this would not be an option. Additionally, given that his symptoms are under good control and his model for [ESLD] is artificially elevated with a high indirect bilirubin, I suspect that he would not require transplant in the short term regardless.

*Id.* at 407.

### C. **The Court's Rule 706 Neutral Expert, Dr. Joseph Tector**.

The Court granted the plaintiff's motion for the Court to appoint a neutral medical expert pursuant to Rule 706 of the Federal Rules of Evidence. *See* Filing No. 91 at 1. As noted in the Court's Order, "[t]he purpose of this rule is to allow the Court to obtain neutral expert testimony when 'scientific or specialized knowledge will help the court to understand the evidence or decide a disputed fact.'" *Id.* (quoting *Elcock v. Davidson*, 561 Fed. Appx. 519, 524 (7th Cir. 2014)).

After the parties were unable to agree on an expert or the appropriate scope of the expert's testimony, the Court appointed Dr. Joseph Tector to serve as the neutral expert. *See* Filing No. 97.

The parties agreed on the medical records that should be sent to Dr. Tector, and the Court set forth specific questions Dr. Tector's expert report should answer. *See id.* at 2-3.

Dr. Tector completed his expert report on March 12, 2018. *See* Filing No. 116-1. His most pertinent conclusions for the purposes of the instant summary judgment motions are summarized below.

First, Dr. Tector offered an opinion regarding the management of Mr. Niksich's pain caused by his ESLD. He stated generally that pain management for ESLD is "challenging" because many pain medications "are metabolized in the liver." Filing No. 116-1 at 1. Specifically, Dr. Tector explained that Tylenol "is the first line medication" for patients with ESLD, and opioids (such as morphine) "are generally reserved for intractable pain," so they are "only used when Tylenol does not adequately control pain in patients with cirrhosis and [ESLD]." *Id.* For this reason, Dr. Tector stated that the drug Norco, although not a "frontline drug" for patients with ESLD, "was appropriate" for Mr. Niksich "given the intractable nature of his condition." *Id.* at 2. Overall, Dr. Tector concluded that the records he was provided "show that consideration was given to appropriate dosing of Mr. Niksich's pain management in light" of his ESLD, *id.* at 6, but when asked specifically about the six-month period where Mr. Niksich was denied pain medication, Dr. Tector stated that he "could not find" the period being referenced, *id.* at 2.

Second, Dr. Tector offered an opinion regarding Mr. Niksich's Hepatitis C treatment. He concluded that Mr. Niksich received "the state of the art" treatment of Harvoni and Ribavirin, which cured his Hepatitis C. *Id.* at 6.

Finally, Dr. Tector offered an opinion as to Mr. Niksich's eligibility for a liver transplant. Among other things, Dr. Tector concluded that Mr. Niksich "appears to be an appropriate candidate from a disease indication standpoint, [but] he would still need to be evaluated from a

cardiovascular point of view . . . to be deemed a suitable medical candidate for liver transplantation." *Id.* at 3. Dr. Tector further stated that Mr. Niksich's incarceration does not definitively preclude him from receiving a liver transplant, but "a prisoner actually receiving an organ transplant is an extremely rare occurrence," in part because a majority of liver transplant providers view incarceration as at least a relative contraindication for liver-transplant eligibility, although each transplant provider may determine its own eligibility criteria. *Id.* at 4. A transplant program would have to "evaluate what life in prison actually entails" to determine whether the post-transplant support and environment offered to a prisoner would be adequate, and Dr. Tector was "unaware of any liver transplant program that has gone to these lengths to establish the feasibility of transplanting prisoners." *Id.* at 5. Finally, Dr. Tector concluded that it was "reasonable for the defendants to conclude" based on the letter from IU Health that Mr. Niksich is ineligible for a transplant, although it is "possible that another program might consider him a suitable candidate." *Id.*

### III.
### Discussion

Mr. Niksich contends that different subsets of the three individual Medical Defendants violated his Eighth Amendment rights in four respects: (1) providing inadequate Hepatitis C treatment; (2) failing to send him to an outside specialist to evaluate how his ESLD should be treated; (3) refusing to adequately treat his pain; and (4) failing to undertake sufficient efforts to seek a liver transplant. The Court will first set forth the legal standards governing Eighth Amendment medical claims before addressing the above four claims. Then the Court will turn to Mr. Niksich's Eighth Amendment claims against Corizon and Warden Brown.

## A. Legal Standards Governing Eighth Amendment Medical Claims

Because Mr. Niksich was a prisoner during all relevant periods, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc). To show deliberate indifference, "a plaintiff does not need to show that the official intended harm or believed that harm would occur," but "showing mere negligence is not enough." *Id.* at 728. Instead, a plaintiff must "provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Id.*

The parties do not dispute that Mr. Niksich's medical conditions are objectively serious. Thus, only the second element is at issue for each of Mr. Niksich's claims—whether the defendants were deliberately indifferent to those serious medical conditions.

## B. Eighth Amendment Claims against the Individual Medical Defendants

The Court will address each of Mr. Niksich's serious medical conditions in turn, addressing whether any individual medical defendant was deliberately indifferent to each condition.

###### 1. Hepatitis C

The Court turns first to whether any individual defendant was deliberately indifferent to Mr. Niksich's Hepatitis C. Mr. Niksich was diagnosed with Hepatitis C in 1990 when he was in the custody of IDOC. He had Hepatitis C until approximately September 2015, when it was cured following a twelve-week regimen of Harvoni and Ribavirin.

Mr. Niksich asserts he received inadequate medical care for his Hepatitis C for several years. *See, e.g.*, Filing No. 153 at 2. The earliest he was under the care of an individual Medical Defendant in this action—and thus the earliest any of them could be held personally liable under § 1983 for his care, *see Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015)—was in September 2014 when he was transferred to New Castle and under the care of defendant Dr. Loveridge. Filing No. 152-1 at 2.

Dr. Loveridge first recommended Mr. Niksich for Hepatitis C treatment in March 2015, when Mr. Niksich's lab results showed that Hepatitis C was "detectable at large levels in Mr. Niksich's body." Filing No. 144-2 at 11. He then initiated the process for determining whether Mr. Niksich was a candidate for Hepatitis C treatment, which continued into April. *Id.* After further testing, on April 22, 2015, Dr. Loveridge submitted a request for the treatment, Harvoni, the same day. *Id.* Mr. Niksich was transferred from New Castle to Wabash Valley on May 29, 2015, before he began his Harvoni treatment, and thus Dr. Loveridge had no more involvement in Mr. Niksich's medical care.

Once Mr. Niksich arrived at Wabash Valley, he was placed under the care of defendant Dr. Byrd. At Mr. Niksich's first appointment with Dr. Byrd on June 5, 2015, Dr. Byrd notified Mr. Niksich that he had been approved for the Hepatitis C treatment of Harvoni and Ribavirin and

requested the drug that day. Filing No. 144-4 at 3. Three days later, Mr. Niksich began his twelve-week medication regimen, which cured him of Hepatitis C by September 2015. *Id.* at 7.

The Court's neutral expert, Dr. Tector, concluded in his expert report that Mr. Niksich received "the state of the art" treatment of Harvoni and Ribavirin, which cured his Hepatitis C. Filing No. 116-1 at 6. He elaborated on this conclusion in his deposition, stating that Mr. Niksich received the drugs used to effectively treat hepatitis C "early," and given that the drugs were only recently available, Dr. Tector was "surprised that [Mr. Niksich] got [them] as early as he did." Filing No. 144-5 at 68. When asked whether there were other treatments available prior to the release of these medications, Dr. Tector responded, "effective ones, not really." *Id.*

The above evidence establishes the following regarding Dr. Loveridge's treatment of Mr. Niksich's Hepatitis C. Mr. Niksich had Hepatitis C for twenty-four years when he came under the care of Dr. Loveridge in September 2014. For nearly all of that time, there was not a reliably effective cure for Hepatitis C. Only six months later, after receiving concerning lab results, Dr. Loveridge began the process that ultimately led to Mr. Niksich receiving a "state of the art" cure for his Hepatitis C, and he received it "early" given how new the medications were. The only involvement of another defendant was that of Dr. Byrd, who, days after Mr. Niksich became his patient, informed Mr. Niksich that he was approved for Hepatitis C treatment, ordered the medications, and provided them to Mr. Niksich shortly thereafter. After taking the medications, Mr. Niksich was cured of Hepatitis C.

To show deliberate indifference, Mr. Niksich would have to establish that Drs. Loveridge or Byrd "knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. The foregoing evidence shows that, rather than disregarding his Hepatitis C, Drs. Loveridge and Byrd obtained the state-of-the-art treatment for Mr. Niksich and did so "early." No reasonable jury

could conclude based on this evidence that they were deliberately indifferent to Mr. Niksich's Hepatitis C.

Even if Mr. Niksich's claim is predicated on a delay in treatment—the six-month period from when Dr. Loveridge began treating Mr. Niksich to when he initiated the process to obtain Hepatitis C treatment—Dr. Loveridge is still entitled to summary judgment. "Delaying treatment, even if not life threatening, can be evidence of deliberate indifference." *Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018); *see Petties*, 836 F.3d at 730 ("[A]nother type of evidence that can support an inference of deliberate indifference is an inexplicable delay in treatment which serves no penological interest."). But again, Dr. Tector testified that he was "surprised" how "early" Mr. Niksich received the Hepatitis C medications given how recently they had become available. When directly asked if he approved of the Hepatitis C treatment Mr. Niksich received, Dr. Tector responded, "absolutely." Filing No. 144-5 at 47. Based on this testimony, and the absence of evidence to the contrary, no reasonable jury would conclude that the delay in Mr. Niksich receiving Hepatitis C treatment was due to any deliberate indifference on Dr. Loveridge's part; rather than an inexplicable delay, the evidence shows that Dr. Loveridge obtained state of the art treatment for Mr. Niksich "early."

Moreover, "[t]o show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730-31; *see Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009) (explaining that an Eighth Amendment claim based on delay will fail "unless the plaintiff introduces verifying medical evidence that shows his condition worsened because of the delay"). There is no evidence in the record that the six-month period exacerbated

Mr. Niksich's Hepatitis C or unnecessarily prolonged his pain (which Dr. Loveridge was effectively treating with morphine).

For these reasons, Drs. Loveridge and Byrd are entitled to summary judgment on Mr. Niksich's Eighth Amendment claim regarding his Hepatitis C treatment.

### 2. Pain Management

Mr. Niksich maintains that Dr. Byrd violated his Eighth Amendment rights by acting with deliberate indifference toward his severe and intractable abdominal pain. Specifically, Mr. Niksich points to the at least six-month period from October 2015 until April 2016 when he was under Dr. Byrd's care and completely denied pain medication.[10]

To establish deliberate indifference, Mr. Niksich must provide evidence that Dr. Byrd "*actually* knew of and disregarded a substantial risk of harm" when he failed to provide him pain medication for six months. *Petties*, 836 F.3d at 728. Although Mr. Niksich eventually received pain medications, "[d]elaying treatment, even if not life threatening, can be evidence of deliberate indifference." *Wilson*, 901 F.3d at 822.

In 2014, Dr. Loveridge prescribed Mr. Niksich several different pain medications to alleviate his abdominal pain, including Ultram, Tylenol 3, and Norco, none of which were consistently effective. Filing No. 152-1 at 2-3. In late March 2015, after consulting the then Regional Medical Director, Dr. Loveridge prescribed Mr. Niksich morphine, which was effective in controlling his pain. *Id.* at 3, 11. When Mr. Niksich was transferred to Wabash Valley and Dr.

---

[10] Mr. Niksich does not maintain that Dr. Loveridge was similarly deliberately indifferent to his pain. *See* Filing No. 153 at 14-15. Nor could he, as Dr. Loveridge provided Mr. Niksich morphine, which is the pain medication that alleviated Mr. Niksich's pain as well as the medication that Dr. Byrd denied him.

Byrd's care in June 2015, he was transferred with his morphine prescription. Filing No. 144-4 at 2-3.

Mr. Niksich's Hepatitis C was cured in September 2015, however, curing Hepatitis C does not cure ESLD. On September 15, 2015, Dr. Byrd discontinued Mr. Niksich's morphine prescription. Filing No. 152-1 at 3. Mr. Niksich remained without any pain medication for the next several months, until, after consultation with the then Regional Medical Director, Dr. Byrd prescribed him Norco on April 28, 2016, which Mr. Niksich immediately complained was ineffective. *See* Filing No. 144-3 at 250, 331; Filing No. 152-1 at 7.

During the six-month period when Mr. Niksich was without pain medication, he repeatedly complained to medical providers that he was experiencing substantial abdominal pain and that he needed to be placed back on morphine. As detailed extensively in the factual background section above, Mr. Niksich complained directly to Dr. Byrd about abdominal pain during appointments on October 16, 2015; November 19, 2015; December 2, 2015; December 18, 2015; January 22, 2016; February 10, 2016; February 19, 2016; April 1, 2016; and April 22, 2016. And he submitted healthcare request forms between many of these dates complaining of abdominal pain that did not lead to visits with Dr. Byrd (although it is unclear whether Dr. Byrd knew of these healthcare requests on every occasion). Despite these consistent complaints of serious pain, Dr. Byrd did not prescribe Mr. Niksich pain medication, let alone morphine—the only pain medication that had worked in the past. This was the case even though, during the April 22 appointment, Dr. Byrd noted that Tylenol, Tylenol 3, and Tramadol had not provided pain relief in the past, but morphine had. Filing No. 144-3 at 243.

After several more complaints that Norco was ineffective throughout May and June 2016, Mr. Niksich was placed under the care of Dr. Chavez in July 2016. By August, Dr. Chavez

increased Mr. Niksich's dosage of Norco. Throughout September and October 2016, Mr. Niksich informed Dr. Chavez that the increased dosage of Norco was ineffective. She therefore prescribed him morphine on October 20, 2016.

After numerous requests, Mr. Niksich was taken to see an outside GI specialist, Dr. Sozio, on December 16, 2016. She concluded that Mr. Niksich's symptoms were "under good control," and that the current treatment is "management of pain, which is currently being done with narcotics." Filing No. 144-3 at 407. Mr. Niksich was taking morphine at the time.

The foregoing reveals that Mr. Niksich suffered from intractable, severe abdominal pain for six months without Dr. Byrd prescribing him any pain medication. This alone might be sufficient for a reasonable jury to conclude that Dr. Byrd was deliberately indifferent to Mr. Niksich's pain, as Dr. Byrd "persist[ed] in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 730; *see id.* (stating that one "clue[]" a doctor knew his treatment decision "could cause serious harm" and thus demonstrate deliberate indifference includes "evidence that the patient repeatedly complained of enduring pain with no modification in care"). It was known to be ineffective not only because Mr. Niksich consistently complained of pain to Dr. Byrd, but Dr. Byrd knew that various pain medications Dr. Loveridge had prescribed to Mr. Niksich were ineffective and morphine was effective.[11] *See* Filing No. 144-3 at 243 (Dr. Byrd, noting during the April 22, 2016, appointment with Mr. Niksich, that Tylenol, Tylenol 3, and Tramadol did not provide Mr. Niksich any pain relief in the past, but morphine had).

---

[11] The Medical Defendants argue that Dr. Byrd simply disagreed with Dr. Loveridge. It is true that a "[d]isagreement . . . between two medical professionals[] about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). But Mr. Niksich is not relying merely on a disagreement between Drs. Byrd and Loveridge to show deliberate indifference. As noted, at the very least, he also produced evidence that Dr. Byrd persisted in a course of treatment he knew was ineffective. *See Petties*, 836 F.3d at 730.

But there is additional evidence that would allow a jury to conclude Dr. Byrd was deliberately indifferent to Mr. Niksich's pain. First, the two doctors who treated Mr. Niksich before and after Dr. Byrd—Drs. Loveridge and Chavez—progressed with relative speed through various pain medications until they prescribed morphine, which was effective. The approach of Drs. Loveridge and Chavez stand in stark contrast to Dr. Byrd's inaction for over six months. This is especially true given that Dr. Byrd acknowledged that, "given [Mr. Niksich's] terminal state, a request for opiate treatment would be reasonable." Filing No. 144-3 at 237.

Second, a reasonable jury could conclude that Dr. Byrd had a non-medical reason to treat Mr. Niksich's pain differently than the other doctors—namely, that Dr. Byrd was not permitted to prescribe controlled substances at the time. *See Perkins v. Byrd*, No. 2:15-cv-336-WTL-MJD, Filing No. 25-1 at 2-3; Filing No. 34-1 at 3. In conjunction with the other evidence presented, a reasonable jury could conclude that this was the reason Dr. Byrd waited over six months, until April 28, 2016, to even reach out to the Regional Medical Director, Dr. Kuenzli, for "any suggestions" regarding Mr. Niksich's pain management. Filing No. 144-3 at 250.

The Medical Defendants resist the conclusion that Mr. Niksich's pain management was inappropriate primarily on two bases. First, they rely on Dr. Tector's expert report and deposition testimony to argue that the pain management was appropriate. However, Dr. Tector's opinion regarding pain management was inconclusive. Although Dr. Tector described pain management for individuals with ESLD to be "challenging," Filing No. 116-1 at 1, and a "gray zone," Filing No. 144-5 at 61, he described generally how pain management should proceed. Specifically, he stated that Tylenol is the "first line medication," and opioids (such as morphine) "are generally reserved for intractable pain," so they are "only used when Tylenol does not adequately control pain in patients with cirrhosis and [ESLD]." Filing No. 116-1 at 1.

When specifically asked about the six-month period when Mr. Niksich was under Dr. Byrd's care and was without pain medication altogether, Dr. Tector unfortunately could not locate this period of time in the medical records. *See* Filing No. 116-1 at 2. Dr. Tector was further questioned about this period during his deposition, stating that based on his review of the medical records, failing to provide pain medication during this period was "not inappropriate" because Mr. Niksich "doesn't complain of pain on some of those visits." Filing No. 144-5 at 61. But, as noted above, Mr. Niksich disputes the accuracy of those medical records, stating that he consistently complained of abdominal pain to Dr. Byrd. That Mr. Niksich filed numerous healthcare requests complaining of pain corroborates this.

The Court is thus left with testimony from its neutral expert that Mr. Niksich's failure to receive pain medication was not problematic, but it was based on a disputed factual premise—that Mr. Niksich was not complaining of pain during the six-month period. This disputed factual premise precludes Dr. Tector's opinion from entitling Dr. Byrd to summary judgment on this issue. This is especially true when considered with Dr. Tector's testimony that, for example, providing Mr. Niksich with Norco could be appropriate if he had intractable pain, *see* Filing No. 116-1 at 2-3, which the facts in the light most favorable to Mr. Niksich show he did. Yet Dr. Byrd provided no pain management for over six months, let alone morphine, the only pain management that had ever been effective.

Second, the Medical Defendants argue that Dr. Byrd could not have been deliberately indifferent because he had a medical reason not to prescribe pain medication during this period. *See* Filing No. 145 at 46-47. Specifically, Dr. Byrd's affidavit and the medical records reflect that he was concerned about the possibility that pain medication would mask abdominal pain, which is

a symptom of potentially fatal spontaneous bacterial peritonitis.[12]  *See, e.g.*, Filing No. 144-3 at 201 (Dr. Byrd stating that "unfortunately" Mr. Niksich was treated with morphine in the past, which "seemed to be a drastic measure" given that Dr. Byrd needs to know if there is a spike in abdominal pain "due to his high risk of [spontaneous bacterial peritonitis]"); Filing No. 144-3 at 243 (same).

Mr. Niksich responds that this justification for denying him pain medication is pretextual, as he was hospitalized for bacterial peritonitis when symptoms other than extreme pain arose (sepsis, loss of consciousness, incoherence, nausea, and blood in his urine).  Filing No. 153 at 15 (citing Filing No. 152-1 at 4).  Given the undisputed presence of these other symptoms, Mr. Niksich argues that Dr. Byrd had no basis to be concerned that spontaneous bacterial peritonitis would arise without other symptoms presenting and thus masking one other symptom of bacterial peritonitis—abdominal pain—with pain medication would not put Mr. Niksich at risk.  *Id.*

Dr. Byrd does not directly address this argument in his reply, and thus does not dispute that Mr. Niksich presented with other non-pain-related symptoms of bacterial peritonitis.  At most, he argues that the evidence still shows he was using medical judgment when deciding to not prescribe pain medication because he was concerned about spontaneous bacterial peritonitis.  *See, e.g.*, *Pyles*, 771 F.3d at 411 (holding that there was no evidence of deliberate indifference because there was a lack of evidence that the defendant doctor's "exercise of medical judgment departed significantly from accepted professional norms").  Perhaps Dr. Byrd was using reasonable medical judgment, and a jury could conclude as much.  But taking the abundance of circumstantial evidence

---

[12]  According to the Mayo Clinic, bacterial peritonitis is a bacterial infection that causes inflammation of the peritoneum (the membrane that lines one's inner abdominal wall and covers the organs within the abdomen).  It is potentially life-threatening if it is not promptly treated.  Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/peritonitis/symptoms-causes/syc-20376247 (last visited, May 3, 2019).

in the light most favorable to Dr. Niksich—especially the evidence (1) that at least some other doctors did not share Dr. Byrd's concern (including Mr. Niksich's treating doctors before and after Dr. Byrd and the only specialist who evaluated Mr. Niksich), (2) that Dr. Byrd himself eventually prescribed Norco to Mr. Niksich despite his stated concern, (3) that Dr. Byrd was unable to prescribe controlled substances at this time, and (4) the unrebutted evidence that Mr. Niksich's other symptoms of bacterial peritonitis undermined any concern that it would not be detected—a reasonable jury could also conclude that this justification was pretextual rather than an exercise in medical judgment, and thus Dr. Byrd acted with deliberate indifference.[13] *Cf. Petties*, 836 F.3d at 728 (noting that there is "[r]arely if ever" direct evidence of deliberate indifference, so "[m]ost cases turn on circumstantial evidence").

In the end, "the receipt of some treatment does not defeat a claim of deliberate indifference, especially when the treatment does not address the chief complaint: pain." *Ayoubi v. Dart*, 729 Fed. Appx. 455, 460 (7th Cir. 2018) (citation omitted); *see Rivera v. Gupta*, 836 F.3d 839, 842 (7th Cir. 2016) (holding that summary judgment was improper for the defendant prison doctor because he failed to "provide any medical treatment for [the plaintiff's] pain"). A reasonable jury

---

[13] Dr. Tector discussed the concern of spontaneous bacterial peritonitis during his deposition. In some respects, he validates Dr. Byrd's opinion that it was a concern. *See* Filing No. 144-5 at 57. But Dr. Tector explained that this concern is why Mr. Niksich should be evaluated by a specialist. *Id.* at 57-58. In this regard, Mr. Niksich's claims regarding his pain management and need to see a specialist, which is discussed below, are intertwined. Below, the Court concludes that there is sufficient evidence that Dr. Byrd exhibited deliberate indifference when he failed to send Mr. Niksich to a specialist. Therefore, the fact that Dr. Tector recognized that spontaneous bacterial peritonitis was a concern, but one that should have been evaluated by a specialist, does not establish as a matter of law that Dr. Byrd was not deliberately indifferent to Mr. Niksich's pain. Even if Dr. Byrd was exercising medical judgment, a reasonable jury could conclude that Dr. Byrd should have sent Mr. Niksich to a specialist as Dr. Tector suggests, who then could have adequately treated Mr. Niksich's pain. Again, when Mr. Niksich finally saw a specialist, she did not recommend discontinuing morphine.

could conclude that Dr. Byrd failed to address Mr. Niksich's constant complaints of pain. Accordingly, Dr. Byrd is not entitled to summary judgment on Mr. Niksich's claim that Dr. Byrd was deliberately indifferent to Mr. Niksich's pain. This claim will proceed to trial.

### 3. Liver Transplant

Mr. Niksich contends that Dr. Byrd[14] was deliberately indifferent to his ESLD by failing to take appropriate steps to secure him a liver transplant—the only cure for his ESLD. Specifically, Mr. Niksich argues that Dr. Byrd failed to supply the IU Health Transplant Team with sufficient information for them to make an informed decision about whether Mr. Niksich was a suitable candidate for a liver transplant, and that, other than his incarceration, Dr. Tector concluded that Mr. Niksich was a good candidate for a liver transplant (but needed further cardiovascular testing to confirm that).

The Medical Defendants offer several responses. First, they argue that Dr. Byrd had no reason to submit more information[15] to the IU Health Transplant Team because they did not require any additional information. Second, they argue that Dr. Byrd was not deliberately indifferent because he referred Mr. Niksich to a transplant center, and Dr. Byrd cannot control whether he is accepted. Relatedly, the Medical Defendants point out that Dr. Tector concluded it was reasonable for Dr. Byrd to rely on the IU Health Transplant Team's letter stating that Mr. Niksich was not a viable candidate. Finally, the Medical Defendants argue that Dr. Sozio—the only specialist to have personally evaluated Mr. Niksich—concluded that Mr. Niksich was not a candidate for a liver

---

[14] To the extent Mr. Niksich also raises claims against Drs. Loveridge and Hinchman regarding the failure to obtain Mr. Niksich a liver transplant, the below reasoning would also entitle them to summary judgment on those claims.

[15] The Court is surprised and somewhat troubled by the fact that the Medical Defendants have no record of precisely what medical records were sent to the IU Health Transplant Team.

transplant, thus any failures by Dr. Byrd in pursuing a liver transplant did not harm Mr. Niksich, as he was not a candidate for a liver transplant in any event.

Recall that approximately a month after Dr. Byrd referred Mr. Niksich to the IU Health Transplant Team, it sent a letter stating that Mr. Niksich's incarceration renders him ineligible for a liver transplant because it does not "lend[] itself to the necessary support system or controlled environment" necessary to ensure proper recovery from a liver transplant.  Filing No. 144-3 at 355.  However, the letter also stated that medical providers at Wabash Valley should let them know if they "could assist in contacting other transplant programs who might have different candidate criteria." *Id.*  There is no evidence that any medical provider followed up on the offer to assist in contacting other transplant programs on Mr. Niksich's behalf.

Dr. Tector offered several opinions about Mr. Niksich's need and eligibility for a liver transplant, as well as whether the Medical Defendants acted reasonably in pursuing a liver transplant.  Among other things, Dr. Tector concluded that Mr. Niksich "appears to be an appropriate candidate from a disease indication standpoint, [but] he would still need to be evaluated from a cardiovascular point of view . . . to be deemed a suitable medical candidate for liver transplantation."  Filing No. 116-1 at 3.  Dr. Tector further stated that Mr. Niksich's incarceration does not definitively preclude him from receiving a liver transplant, but "a prisoner actually receiving an organ transplant is an extremely rare occurrence," in part because a majority of liver transplant providers view incarceration as at least a relative contraindication for liver-transplant eligibility, although each transplant provider may determine its own eligibility criteria. *Id.* at 4.  To overcome this concern, Dr. Tector explained during his deposition that any transplant team would likely need to send at least a social worker to the prison to figure out precisely what the daily life of an inmate who needs post-operative care would entail.  Filing No. 144-5 at 32-9.

Finally, Dr. Tector concluded that it was "reasonable for the defendants to conclude" based on the letter from IU Health that Mr. Niksich is ineligible for a transplant, although it is "possible that another program might consider him a suitable candidate." Filing No. 116-1 at 4.

Mr. Niksich's claim and the Medical Defendants' arguments present several novel legal questions that few federal courts have addressed. For example: (1) To what lengths do prison medical providers have to go in order to not be deliberately indifferent to a prisoner's need for a transplant? (2) Is merely referring him to a single transplant center enough? (3) Is it deliberate indifference for medical providers not to pursue an offer from that transplant center to aid in referring the patient to other transplant centers that have different patient criteria? (4) If the transplant center denied the referral based solely on the conditions to which the prisoner would return, what obligation do medical providers have to attempt to fix those concerns and create an appropriate post-operative environment?

In the end, the Court need not resolve any of these difficult legal questions because Mr. Niksich has no evidence that he was injured by any of Dr. Byrd's purported failings. In other words, no reasonable jury could conclude that, had Dr. Byrd done anything differently, Mr. Niksich would have been placed on a liver transplant list (let alone received a liver transplant). "No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013).

Here, the IU Health Transplant Team denied Mr. Niksich's referral because he was incarcerated. Neither the IU Health Transplant Team nor Dr. Tector (whose opinion was based on a review of the medical records) personally evaluated Mr. Niksich's eligibility for a liver

transplant. But Dr. Sozio, a GI specialist, did in December 2016. As to Mr. Niksich's ESLD, she stated as follows:

> We discussed that though his model for [ESLD] is high in part because of his high bilirubin, which has been consistently predominately indirect, clinically he is doing well with his symptoms under good control. He recalls being referred for transplant, but with him being currently incarcerated, this would not be an option. Additionally, given that his symptoms are under good control and his model for [ESLD] is artificially elevated with a high indirect bilirubin, I suspect that he would not require transplant in the short term regardless.

Filing No. 144-3 at 407. Important here is Dr. Sozio's conclusion that Mr. Niksich would not require a liver transplant in the short term, whether or not he was incarcerated. *Id.*

Furthermore, Dr. Tector believed it was reasonable for Dr. Byrd to rely on the IU Health Transplant Team's letter dated July 18, 2016, as the end of the matter with respect to Mr. Niksich obtaining a liver transplant. Filing No. 116-1 at 5. But even if Dr. Byrd were deliberately indifferent by not taking further steps in an attempt to secure Mr. Niksich a liver transplant, there is no evidence that Dr. Byrd's failure to do so injured Mr. Niksich by precluding him from obtaining, or even being approved for, a liver transplant. Instead, the only evidence—from the only specialist that personally evaluated Mr. Niksich—suggests that Mr. Niksich's ESLD was well-managed and he was not a candidate for a liver transplant during the relevant time. No reasonable jury could conclude from this evidence that any of Dr. Byrd's purported failings injured Mr. Niksich, as he was not a candidate for a liver transplant anyway. Put differently, even if Dr. Byrd had made additional efforts to secure Mr. Niksich a liver transplant, Mr. Niksich would be no closer to receiving a liver transplant. *See Jackson*, 733 F.3d at 790 ("For there is no tort—common law, statutory, or constitutional—without an injury[.]"). Accordingly, Dr. Byrd is entitled to summary judgment on Mr. Niksich's claims regarding a liver transplant.

### 4. Referral to an Outside Specialist

Mr. Niksich contends that Drs. Loveridge, Byrd, and Hinchman violated his constitutional rights by failing to send him to an outside specialist. "[I]f the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the 'obdurate refusal' to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition." *Pyles*, 771 F.3d at 412; *see id.* at 411 ("[T]he choice whether to refer a prisoner to a specialist involves the exercise of medical discretion, and so refusal to refer supports a claim of deliberate indifference only if that choice is 'blatantly inappropriate[.]'" (citations omitted)).

To prove that they were deliberately indifferent to his need to see a specialist, Mr. Niksich points to two evidentiary sources. First, IDOC policy regarding the "Management of Hepatitis C" states that inmates with ESLD secondary to Hepatitis C "shall be provided with off-site consultation with a hepatologist or GI specialist for recommendations. If a liver transplant is recommended, the offender shall be referred to the appropriate off-site provider." Filing No. 152-4 at 3. Second, Dr. Tector was asked when patients with ESLD should be sent to a hepatologist, and he responded, "if you have been diagnosed with a serious liver disease or ailment, you should see a hepatologist." Filing No. 144-5 at 54.

The individual Medical Defendants respond that, at most, they disagreed that Mr. Niksich needed to see a specialist, and a disagreement among medical professionals is insufficient to show deliberate indifference. As to the IDOC Hepatitis C policy, they argue that violations of state law or IDOC policy do not amount to constitutional violations. Moreover, Dr. Hinchman argues that he was not personally involved in the deciding whether or not to send Mr. Niksich to a specialist.

As an initial matter, Dr. Hinchman is correct that "[a] damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation." *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014). However, a dispute of material fact exists regarding whether Dr. Hinchman was personally involved in the decision to send Mr. Niksich to a specialist. Although Dr. Hinchman presents evidence that he was only involved in the decision to treat Mr. Niksich's Hepatitis C and the decision to refer Mr. Niksich to the IU Health Transplant Team, as well as evidence that he had no authority over whether Mr. Niksich was sent to an outside specialist, Filing No. 144-1 at 1-2, Mr. Niksich provides evidence that Dr. Byrd told Mr. Niksich he was unable to refer Mr. Niksich to a specialist on January 22, 2016, because the then Regional Medical Director, Dr. Hinchman, would not allow him to, Filing No. 152-1 at 5-6.[16] Thus, there is a factual dispute regarding Dr. Hinchman's personal involvement, and the question becomes whether there is sufficient evidence of deliberate indifference.

The individual Medical Defendants are correct that a "[d]isagreement . . . between two medical professionals[] about the proper course of treatment generally is insufficient, *by itself*, to establish an Eighth Amendment violation," *Pyles*, 771 F.3d at 409 (emphasis added), and that violations of state law or policy do not necessarily establish an Eighth Amendment violation. But

---

[16] The Medical Defendants object to this evidence under Federal Rule of Evidence 602, arguing that Mr. Niksich has no personal knowledge of Dr. Hinchman's job responsibilities nor personal knowledge of conversations between Dr. Byrd and Dr. Hinchman. *See* Filing No. 160 at 16. Rule 602 provides that a "witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." An objection under Rule 602, however, is misplaced, as Mr. Niksich has personal knowledge of what Dr. Byrd told him. And Dr. Byrd told Mr. Niksich he could not see a specialist because Dr. Hinchman would deny the request. A jury will not be required to credit this testimony, especially if Dr. Hinchman testified he did not have such authority or involvement. But a jury may well credit Mr. Niksich's testimony and reasonably conclude that Dr. Hinchman was personally involved in the decision not to send Mr. Niksich to an outside specialist.

the Seventh Circuit has made clear, particularly as to the latter type of evidence, that violations of policy constitute circumstantial evidence of deliberate indifference. *See Petties*, 836 F.3d at 729 ("While published requirements for health care do not create constitutional rights, such protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm." (citation and quotation marks omitted)). Moreover, the Court's neutral expert is a specialist (unlike Drs. Loveridge and Byrd), and he unequivocally testified that if you have been diagnosed with a serious liver disease or ailment, "you should see a hepatologist." Filing No. 144-5 at 54.

Taken together, the individual Medical Defendants' direct violation of IDOC policy stating that Mr. Niksich "shall" be sent to a specialist, and the Court's neutral expert concluding that anyone with his ailments "should" be sent to a specialist would allow a reasonable jury to conclude that the individual Medical Defendants were deliberately indifferent to Mr. Niksich's pain and need to be evaluated for a liver transplant due to his ESLD.[17]

This does not mean, however, that Mr. Niksich has a viable claim. Mr. Niksich eventually was sent to see a specialist, Dr. Sozio, on December 16, 2016. Thus, at most, his claim against the individual Medical Defendants is that they delayed sending him to a specialist. As noted above, "[t]o show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730-31.

There is sufficient evidence for a jury to conclude that the delay attributable to Dr. Byrd and Dr. Hinchman unnecessarily prolonged Mr. Niksich's pain, but not so as to Dr. Loveridge. As

---

[17] Drs. Loveridge and Byrd were not deliberately indifferent to Mr. Niksich's Hepatitis C for the reasons set forth above—namely, they provided him with state-of-the-art Hepatitis C treatment that cured his Hepatitis C.

discussed above, Dr. Loveridge progressed through various pain medications until he reached morphine, which was effective. This approach accords with Dr. Tector's testimony regarding pain management for those with ESLD. *See* Filing No. 116-1 at 1-3. Thus, there is no evidence that, had Dr. Loveridge referred Mr. Niksich to a specialist, his pain would have been treated differently.

But, as also discussed above, Dr. Byrd simply failed to prescribe any pain medication for at least a six-month period. This is in tension with the evidence in the record from the specialists, Dr. Tector and Dr. Sozio. Without repeating in detail the evidence discussed above, Dr. Tector made clear that opioids were appropriate for treating "intractable pain," Filing No. 116-1 at 1, which Mr. Niksich had. And by the time Mr. Niksich saw Dr. Sozio, he was taking morphine, and she did not recommend changing course. *See* Filing No. 144-3 at 407-08. Taken in the light most favorable to Mr. Niksich, a reasonable jury could conclude that, had Drs. Byrd and Hinchman not unnecessarily delayed sending Mr. Niksich to a specialist, he would have received pain medication much sooner and not experienced "unnecessarily prolonged pain." *Petties*, 836 F.3d at 731.

There is insufficient evidence, however, that the individual Medical Defendants' failure to send Mr. Niksich to a specialist affected his ability to obtain a liver transplant or otherwise exacerbated his ESLD. As noted above, when Dr. Sozio subsequently evaluated Mr. Niksich, she stated the following regarding his ESLD: "clinically he is doing well with his symptoms under good control. . . . Additionally, given that his symptoms are under good control and his model for [ESLD] is artificially elevated with a high indirect bilirubin, I suspect that he would not require transplant in the short term regardless." Filing No. 144-3 at 407. With a specialist having eventually determined that Mr. Niksich's symptoms are "under good control" and that he did not at that time require a transplant, no reasonable jury could conclude that the delay in seeing a

specialist harmed Mr. Niksich by "exacerbate[ing]" his ESLD or delaying a liver transplant. *Petties*, 836 F.3d at 731.

Accordingly, Drs. Loveridge, Byrd, and Hinchman are entitled to summary judgment on Mr. Niksich's claim that they should have sent him to a specialist insofar as it relates to his liver transplant. But summary judgment is denied as to Mr. Niksich's claim that Dr. Byrd's and Dr. Hinchman's failure to send Mr. Niksich to a specialist unnecessarily prolonged his pain. This claim shall proceed to trial.

### C.     Policy or Practice Medical Claim against Corizon

A private entity, such as Corizon, "that has contracted to provide essential government services is subject to at least the same rules that apply to public entities" under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017) (en banc). "The critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Id.* at 379. There are several ways in which a plaintiff may prove this element:

> First, she might show that the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Second, she might prove that the constitutional deprivation[] [was] visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels. Third, the plaintiff might be able to show that a government's policy or custom is made . . . by those whose edicts or acts may fairly be said to represent official policy. As we put the point in one case, [a] person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government . . . . Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice.

*Id.* (citation and quotation marks omitted) (alteration in original).

Mr. Niksich contends that two Corizon policies caused an unconstitutional harm. First, he argues that Corizon's policy of requiring inmates to complete a healthcare request form before receiving treatment regardless of how sick the inmate is (unless the inmate is unconscious), led him to needlessly suffer on May 2, 2016. Second, he challenges Corizon's policy of requiring referrals to outside specialists to be approved by the Regional Medical Director. The Medical Defendants maintain that there is insufficient evidence to support either policy claim.[18] The Court will address each policy in turn.

First, Corizon is not entitled to summary judgment on Mr. Niksich's claim that its policy of requiring inmates to complete a healthcare request form before receiving treatment caused him to experience unnecessary pain and suffering on May 2, 2016. As detailed above, on that date, Mr. Niksich was dizzy, nauseous, feverish, experiencing abdominal pain, and urinating blood, which made it impossible for him to get out of bed. Filing No. 152-1 at 7. Mr. Niksich's cellmate, Mr. Fugate, informed a correctional officer that Mr. Niksich needed to go to the infirmary, but

---

[18] The Medical Defendants also argue that these alleged unconstitutional policies were not included in Mr. Niksich's Complaint "and they should be disregarded for this reason alone." Filing No. 160 at 17. It is true that these specific policies were not articulated in the pro se Complaint. But this is because the Complaint states the policy claim broadly: "[Corizon] ha[s] a policy[] and custom of restricting, and denying medical care, treatment, and medication for serious medical illness and helping pain caused by serious medical illness." Filing No. 2 at 2-3. In its Screening Entry, the Court allowed a similarly broad policy claim to proceed. *See* Filing No. 7 at 2 (noting that Mr. Niksich alleges that Corizon "has a policy or practice of denying medical care, including the type of care he needs for his liver disease"). This broadly stated policy claim encompasses the two specific policies to which Mr. Niksich now points. To the extent Corizon argues that it did not have sufficient notice of the specific policies or practice Mr. Niksich would raise, Corizon had several different tools at its disposal to acquire such notice. For example, Corizon could have served interrogatories or questioned Mr. Niksich at his deposition regarding the specific policies or practices he believe caused him harm, or it could have long ago moved for a more definite statement under Federal Rule of Civil Procedure 12(e). But it did not utilize any of these options (or at least did not point the Court to where it did). Accordingly, the Court will not "disregard" Mr. Niksich's policies claims merely because they are more specifically defined than the broad policy claim allowed to proceed by the Court, as the Medical Defendants had the ability to cure any perceived ambiguity but did not do so.

medical staff told the correctional officer that Mr. Niksich needed to fill out a healthcare request form before receiving treatment. *Id.* Mr. Niksich, however, was unable to do so. *Id.* The correctional officer called the infirmary again, and he was again instructed to have Mr. Niksich fill out a healthcare request form. *Id.* Despite these instructions, the correctional officer took Mr. Niksich to the infirmary due to his dire health condition. *Id.* Mr. Niksich was then taken to Terre Haute Regional Hospital by ambulance. *Id.*

Notably, the Medical Defendants do not contend that Corizon does not have such a policy. Instead, they argue that there is no evidence Mr. Niksich was harmed by this policy because he was "sent to the hospital on the same date" where he received treatment. Filing No. 160 at 18. As noted above, "[t]o show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730-31. A reasonable jury could conclude that a delay in treating a person who was experiencing severe pain, nausea, and urinating blood such that he could not fill out a form or get out of bed—even if he made it to the hospital later that day—caused by Corizon's policy experienced "unnecessarily prolonged pain" due to that policy. *Petties*, 836 F.3d at 731. Accordingly, Mr. Niksich has presented sufficient evidence that Corizon's policy of requiring healthcare request forms to be filled out to obtain medical treatment unless the inmate is unconscious "gave rise to [his] harm."[19] *Glisson*, 849 F.3d at 379. This policy claim against Corizon will proceed to trial.

---

[19] Corizon also argues that requiring an inmate to fill out a healthcare request form "is the same thing as a free person having to call their doctor to make an appointment if they are sick," so "the patient has to actually convey the information to the provider in some form." Filing No. 160 at 18. Not only is this analogy inapt, to say the least, the factual premise on which it is based is undermined by the very facts of this case. Medical providers here *knew* that Mr. Niksich needed medical treatment because a correctional officer told them as much. *See* Filing No. 152-1 at 7. A more apt analogy for a patient that is not incarcerated would be if a family member or friend called

Corizon, however, is entitled to summary judgment on Mr. Niksich's claim that he was harmed by Corizon's policy of requiring referrals to outside specialists to be approved by the Regional Medical Director. Although Corizon disputes the existence of any such policy (relying on its evidence that the treating physician always retains authority to send an inmate to an outside specialist), assuming such a policy exists, it did not cause any harm to Mr. Niksich.

As noted, "[t]he critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Id.* Mr. Niksich provides evidence that Dr. Byrd told him he was unable to refer him to a specialist in January 22, 2016, because the then Regional Medical Director, Dr. Hinchman, would not allow him to. Filing No. 152-1 at 5-6. No reasonable jury could conclude that any delay in sending Mr. Niksich to a specialist was caused by Corizon's policy requiring approval from the Regional Medical Director (as relevant here, Dr. Hinchman), instead of being caused by the decision of Dr. Hinchman to deny a specialist referral. In other words, the delay was not caused by any policy requiring treating doctors to obtain approval, but by the ultimate decisionmaker's denial of the request. Because any harm "resulted from the acts of the entity's agents" rather than the policy itself, *Glisson*, 849 F.3d at 379, Corizon is entitled to summary judgment on Mr. Niksich's second policy claim.

### D. Eighth Amendment Claim against Richard Brown

Mr. Niksich asserts an Eighth Amendment medical claim against Warden Brown, contending that he knew that Mr. Niksich was receiving constitutionally inadequate medical care

---

the doctor to make an appointment on behalf of the patient who was in severe distress, and the doctor responded that regardless of the patient's condition or ability to make a call, the patient needed to personally call in order to be seen. It would be surprising if any medical practices adopted such a practice.

but did nothing to remedy it. Warden Brown argues that he is entitled to summary judgment because he was not personally involved in Mr. Niksich's medical care and thus not responsible under § 1983 for any constitutional harm he suffered.[20] The Court agrees with Warden Brown.

"A damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation." *Matz*, 769 F.3d at 528. Mr. Niksich's only evidence that Warden Brown was personally involved in the above alleged constitutional violations are two letters he wrote directly to Warden Brown complaining of deficient medical care. *See* Filing No. 154-1; Filing No. 154-2. Warden Brown objects to the admissibility of these letters on several bases, including that they are unauthenticated, hearsay, and were not disclosed in discovery. Because the Court agrees that the letters are unauthenticated and thus inadmissible, it need not reach the other bases to exclude the letters.

Federal Rule of Evidence 901(a) requires the proponent of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Warden Brown is correct that Mr. Niksich did not offer any testimony authenticating the letters, nor did he point to any other evidence sufficient to show that the letters are what he now claims they are. Accordingly, Mr. Niksich's two letters are inadmissible under Rule 901(a). *See Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 853 (7th Cir. 1998) (holding that a document was properly excluded under Rule 901(a) because the proponent "did not offer any witness or any affidavit of any person who had personal knowledge of the report").

---

[20] Warden Brown also raises the affirmative defense of qualified immunity. "To determine whether a defendant is entitled to qualified immunity, courts must address two issues: (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation." *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014) (citation and quotation marks omitted). Because the Court concludes that Warden Brown did not violate Mr. Niksich's constitutional rights, it need not discuss the second element of the qualified immunity defense. *See Flournoy v. City of Chi.*, 829 F.3d 869, 877 n.10 (7th Cir. 2016).

Having excluded these letters, Mr. Niksich has no admissible evidence that Warden Brown was aware of, let alone personally involved with, any denial of appropriate medical treatment to Mr. Niksich. *See* Fed. R. Civ. P. 56(c). Warden Brown is therefore entitled to summary judgment.

## IV.
### Conclusion

For the reasons explained, the Medical Defendants' motion for summary judgment, dkt. [144], is **granted in part** and **denied in part**, and Warden Brown's motion for summary judgment, dkt. [146], is **granted**. The following claims for monetary damages and injunctive relief shall proceed to trial: (1) Eighth Amendment claim that Dr. Byrd was deliberately indifferent to Mr. Niksich's pain management; (2) Eighth Amendment claim that Drs. Byrd and Hinchman were deliberately indifferent to Mr. Niksich's need to see an outside specialist; and (3) Eighth Amendment policy claim against Corizon regarding its policy that inmates must fill out a healthcare request form on order to obtain medical treatment regardless of whether they are able to do so. The defendants are entitled to summary judgment on all other claims, meaning no claims against Dr. Loveridge or Warden Brown shall proceed. No partial final judgment shall issue at this time.

The Magistrate Judge is requested to discuss with the parties the further development and resolution of this action, whether by settlement or trial, and to discuss possible trial dates.

**IT IS SO ORDERED.**

Date: 5/10/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

EDWARD J NIKSICH
912883
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Jenai M. Brackett
FROST BROWN TODD LLC (Indianapolis)
jbrackett@fbtlaw.com

Darren Andrew Craig
FROST BROWN TODD LLC (Indianapolis)
dcraig@fbtlaw.com

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Christopher Andrew Farrington
BLEEKE DILLON CRANDALL ATTORNEYS
drew@bleekedilloncrandall.com

Amanda Elizabeth Fiorini
INDIANA ATTORNEY GENERAL
Amanda.Fiorini@atg.in.gov

Benjamin Myron Lane Jones
INDIANA ATTORNEY GENERAL
benjamin.jones@atg.in.gov